Maryellen **BLACK** and James W. Gildard, Plaintiffs,

v.

William J. **SULLIVAN,** Robert L. Woodbury, Walter P. Fridinger, William B. Bullock, Samuel G. Andrews and University of Maine, Defendants.

Civ. No. 80–0164–P.

United States District Court, D. Maine.

April 13, 1983.

Sidney St. F. Thaxter, Ronald A. Epstein, Thaxter, Lipez, Stevens, Broder & Micoleau, Portland, Me., for plaintiffs.

Gordon F. Grimes, Joyce W. Poulin, Bernstein, Shur, Sawyer & Nelson, Portland, Me., for defendants.

## MEMORANDUM DECISION AND ORDER

CYR, District Judge.

The present section 1983 action challenges the constitutionality of the administrative rules and regulations [Rules] of the University of Maine [University] governing

the reclassification, as "residents," of University students previously classified as "nonresidents" for tuition purposes. The plaintiffs, former students of the University of Maine School of Law, assert that the Rules, on their face and as applied, are violative of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution of the United States.

The plaintiffs filed their complaint on June 2, 1980, prior to entering their third year of law school as nonresident students and after having been denied administrative reclassification for the preceding academic year (1979–80). In anticipation of the denial of their requests for reclassification for the 1980–81 academic year, plaintiffs moved, on July 2, 1980, for a preliminary injunction restraining the defendants from requiring plaintiffs to pay nonresident tuitions for the ensuing academic year. In order to obviate the need for preliminary injunctive relief, the parties agreed that the plaintiffs would remit the amount of the difference between resident and nonresident tuition rates for the 1980–81 academic year to the clerk of court for escrowing, subject to the understanding that the escrowed funds, with interest, would be paid over to the prevailing parties.

The case was tried before the Court, sitting without a jury.

*Summary of Contentions*

The plaintiffs argue that the University Rules violate the equal protection clause of the fourteenth amendment: (1) by imposing a substantially greater burden of proof upon students seeking *reclassification* as "residents" than is imposed upon students seeking classification as "residents" at the time of their initial admission to the University, and (2) by impermissibly discriminating against unmarried students, nonmilitary students and students who own no real property in Maine. Plaintiffs further allege denials of due process and equal protection resulting from the application of the

Rules, due to the *de facto* existence of an irrebuttable presumption of nonresidency. Finally, plaintiffs assert that the rejections of their requests for reclassification were so arbitrary and irrational as to constitute denials of their due process rights.

Defendants deny plaintiffs' due process and equal protection claims; and further assert sovereign immunity under the eleventh amendment and that the individual defendants acted in good faith.

*The University Rules*

The University is a state-wide, public, post-secondary education system comprised of seven campuses, including the University of Southern Maine, of which the University of Maine School of Law is a part. The University derives its funding from legislative grants, tuitions and fees, for which it must account to its Board of Trustees.

On March 28, 1973 the Board of Trustees adopted "Rules Governing Residence," upon which the present Rules (Appendix A) are based, following amendments made on March 24, 1976 and on April 27, 1977.

On their face and as applied, the Rules permit attendance at the University upon payment of the lower, resident tuition rates by any student who has been "a bona fide domiciliary of the State for at least a year immediately prior to registration for the term for which resident status is claimed."

The Rules prescribe no explicit regulatory criteria for determining bona fide domiciliary status, except that a student who "has been here for at least a year primarily as a permanent resident and not merely as a student" is considered a domiciliary.[1] But the Rules do describe certain circumstances in which it will be presumed that the student is *not* a bona fide domiciliary, absent adequate proof to the contrary: "[I]f the student is enrolled for a full academic program, as defined by the University, it will be presumed that the student is in Maine for educational purposes and the burden will be on the student to prove otherwise."

---

1. The relevant portion of the Rules reads: "For University purposes, a student does not acquire a domicile in Maine until he or she has been

here for at least a year primarily as a permanent resident and not merely as a student."

The Rules further identify certain specific instances in which reclassification to "resident" status is considered essentially automatic: (1) where a student is a member, or a dependent of a member, of the Armed Forces currently on active duty in Maine; (2) where an unmarried minor student's parent or legal guardian is a bona fide Maine domiciliary; and (3) where a student is married to a "resident" of Maine. But for students not within any of these three categories the only indications of the types of proof required to overcome the presumption of nonresidency are found on the two-page questionnaire to be completed by applicants for reclassification (Appendix B). The information requested on the first page of the questionnaire appears to be aimed at enabling University officials to determine whether the student comes within one of the three categories just mentioned. The second page concerns whether the student: (1) has purchased "property" in Maine; (2) rents property in Maine; (3) is registered to vote in Maine; (4) has a Maine-registered motor vehicle; (5) pays Maine State Income Tax; (6) spends school and summer vacations in Maine; and (7) intends to remain in Maine after completion of his or her educational program.

From the testimony of University officials and from the letters sent to the plaintiffs informing them of the reasons for rejecting their requests for reclassification, it appears that a student's statement of intent to remain in Maine following graduation is insufficient, absent "objective confirmation of [the] statement of intent...." Sullivan letter of May 19, 1981 [Joint Exhibit 1(R)]. Such objective factors as a Maine bank account, a Maine driver's license, a Maine-registered vehicle, an apartment in Maine, and the payment of Maine income taxes are generally considered insufficient to confirm a stated intention to remain in Maine after graduation, because these are considered normal incidents of a temporary Maine residency as well.

Among the more significant factors identified by University officials as indicative of a bona fide domiciliary status are marriage, full-time employment, home ownership, the presence of close family members in Maine, and personal or family connections with Maine antedating admission to the University; although none of these factors is necessarily dispositive.

Approximately 60% of those seeking reclassification in a given year are successful. Most successful applicants have had a prior affiliation with Maine, have been recently married, or have acquired real property in Maine. No evidence was offered as to the number or percentage of unmarried, apartment-dwelling students, with no preadmission connections with Maine, who have succeeded in obtaining reclassification as residents, although the defendants point to plaintiff Black as such a reclassified student.

The Rules provide that the initial administrative decision on reclassification is for the campus business manager. An unsuccessful applicant may then appeal: (1) to the campus Vice President for Finance and Administration; (2) to the campus President; and (3) finally, to the Treasurer of the University (Vice-Chancellor for Finance). Roughly six to eight reclassification requests reach the President of the University of Southern Maine and approximately eight to ten (of approximately 200) reach the University Treasurer each year from all seven campuses.

*Plaintiffs' Reclassification Requests*

Plaintiffs Black and Gildard applied on December 15, 1977 and February 2, 1978, respectively, for admission to the University of Maine School of Law for the 1978–79 academic year. In their applications they claimed that they were residents of New Jersey and Maryland, respectively, as the term "resident" was defined in the instructions. Both plaintiffs came to Portland, Maine prior to the commencement of the 1978 fall semester and resided in local apartments during their first year in law school.

A. *Reclassification Requests for Academic Year 1979–80*

Following her first year of law school, plaintiff Black, on July 31, 1979, filed a

reclassification request with the business manager of the University of Southern Maine, the defendant William Bullock, in accordance with the Rules. In support of her request she stated that she considered herself a bona fide resident of Maine.

By letter dated August 22, 1979 Bullock denied the request for reclassification, explaining that Black had not satisfied the requirement that she "be in the state for at least a year primarily as a permanent resident and not merely as a student," since she had been in Maine "primarily for education purposes." [Joint Exhibit 1(j).]

Pursuant to the Rules, Black "appealed" Bullock's decision to the campus Vice President for Finance and Administration, the defendant Walter Fridinger, stating in a letter dated September 6, 1979 that she intended to remain in Maine following graduation. She also complained that the reclassification questionnaire, focusing primarily on the applicant's economic ties with Maine, was inapposite in her case because she lacked the financial resources to acquire such ties. She explained her reasons for deciding to become a permanent Maine resident, emphasizing her acceptance of Maine summer employment in the face of opportunities for similar employment in New Jersey. At a meeting with the defendant Fridinger, Black explained that she had not resided in New Jersey for a number of years and that before coming to Maine she had lived in Egypt for nearly two years. On September 11, 1979 Fridinger denied the request for reclassification, because Black was in Maine primarily for purposes of her education and she had not submitted "sufficient evidence" to warrant reclassification, despite her stated intention to remain in Maine following graduation. [Joint Exhibit 1(L), at 2.]

The campus president, defendant Robert Woodbury, next rejected her appeal for reclassification, citing the Rules to the effect that " ... a student does not acquire a domicile in Maine until he or she has been here for at least a year primarily as a permanent resident.... " [Joint Exhibit 1(m), at 2.] Whereupon, Black unsuccessfully pursued a final appeal to the Treasurer of the University of Maine, the defendant William Sullivan, who noted, on April 25, 1980, that she had not "established objectively, that at [that] time [she was] a bona-fide domiciliary of the State of Maine." [Joint Exhibit 1(n).]

Plaintiff Gildard applied for reclassification as a Maine resident on June 30, 1979, stating that he had been a registered Maine voter since October, 1978, had rented an apartment in Portland, and had had state income taxes withheld from his summer work-study paychecks. He also attached a Maine driver's license issued to him on June 6, 1979. Following an interview with the defendant Bullock, Gildard's request was denied for the same reason ascribed by Bullock for the denial of Black's reclassification. In a letter to Fridinger, Gildard stated that his legal and financial ties to Maryland had been "broken" and that he had a Maine bank account. He stated that he had come to Maine with the intention of remaining in Maine as a permanent resident and that he had declined to attend a law school in Maryland even though he had been accepted there. At the interview with Fridinger, Gildard submitted a letter from the father of Gildard's former roommate at the University of Maryland, who was a Maine native. They also discussed the fact that Gildard's father had attended a summer camp in Maine during his youth. Fridinger denied Gildard's request and President Woodbury did likewise in a letter essentially identical with that which had been addressed to Black. [Joint Exhibit 1(m).]

Finally, the defendant Sullivan denied reclassification for lack of "external factual evidence" of Gildard's intention to permanently reside in Maine, except for paying rent, working part-time at the University, registering to vote in Maine, and obtaining a Maine driver's license. Sullivan also pointed to the fact that Gildard had applied to other law schools besides Maine, indicating that "there was no evidence of particular affiliation with Maine prior to [his] acceptance by the Law School." [Joint Exhibit 1(n), at 4.]

### B. Reclassification Requests for Academic Year 1980-81

Plaintiff Black again requested reclassification on July 29, 1980, pointing particularly to her continuous occupancy of an apartment in Portland and her purchase of personal property in Maine. She also submitted an affidavit summarizing her Maine residential and employment history, advising that she had rejected an opportunity to attend Rutgers University School of Law, at the lower resident-tuition rate available to her there, because of her interest in living in Maine. She stated that she decided to become a permanent resident of Maine during the early part of 1979, and that she intended to seek full-time employment in Maine upon her graduation. She also described her involvement in the local community, including her participation in the Democratic Party caucus and her practice of donating blood to the Red Cross on a regular basis. Finally, she reported moving furniture from New Jersey to her Maine apartment.

Once again, by letter dated August 12, 1980 [Joint Exhibit 1(q)], Black's request was rejected by Bullock. On appeal to defendant Samuel Andrews, then the University of Southern Maine Vice President for Finance and Administration, Black's request was again rejected, with Andrews adopting Bullock's reasoning verbatim. President Woodbury in turn found that Black was "in Maine primarily for the purpose of education and [had] not been domiciled here for any other reason." [Joint Exhibit 1(q), at 6.] Finally, defendant Sullivan agreed, stating that "there is no objective evidence that you are in Maine for other than education purposes." [Joint Exhibit 1(q), at 8.]

Plaintiff Gildard again filed an application for reclassification on August 1, 1980, including a detailed affidavit explaining when he became interested in Maine and describing his present affiliation with Maine. Gildard's request was rejected by Bullock, Andrews, Woodbury, and Sullivan, with each ascribing precisely the same reasons given in support of their rejections of Black's second request for reclassification.

### C. Black's Request for Reclassification for the Spring Semester 1981

Following Sullivan's rejection of her request for reclassification as a resident for the 1980 fall semester, Black wrote Bullock on November 10, 1980 informing him that she had accepted a position as law clerk to a state superior court justice and requesting Bullock to reconsider her application for reclassification. Apparently treating her letter as a request for reclassification for the 1981 spring semester, Bullock requested Black to submit responses to the questionnaire. Black complied and, following denials of her request by Bullock, Andrews, and Woodbury, she obtained reclassification as a resident from the defendant Sullivan on May 19, 1981, some 11 months after the filing of the present legal action in this Court.

Sullivan explained that Black's acceptance of employment as a law clerk in Maine was "objective confirmation" of her stated intention to remain in Maine, and that, because she had applied for this position approximately one year prior to the 1981 spring semester, she had shown that she had the requisite intent to remain in Maine during the intervening one-year period and, thus, was a "domiciliary" of Maine for one year prior to the 1981 spring semester.

## DISCUSSION

### Equal Protection Claims

The plaintiffs argue that the Rules, on their face and as applied, create classifications that impermissibly discriminate against: (1) out-of-state student applicants seeking reclassification as residents; (2) unmarried students; (3) nonmilitary students; and (4) nonhomeowning students.

The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.' *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415 [40 S.Ct. 560, 561, 64 L.Ed. 989] (1920). But so too, 'The Constitution does not require things which are different in fact or opin-

ion to be treated in law as though they were the same.' *Tigner v. Texas,* 310 U.S. 141, 147 [60 S.Ct. 879, 882, 84 L.Ed. 1124] (1940). The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.

*Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982).

The plaintiffs argue that it is not enough that defendants show a "reasonable basis," *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), for these classifications, which plaintiffs insist "involve a suspect classification based on wealth and affect the fundamental right to travel."

In support of their argument that persons who "lack wealth" constitute a "suspect" class, plaintiffs rely on a number of Supreme Court decisions which have struck down economic obstacles to the attainment or exercise of fundamental rights. *See Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) [access to ballot for political candidates]; *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) [access to divorce court]; *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 532 (1970) [school board membership]; *Cipriano v. City of Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (*per curiam*) [right to vote]; *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) [counsel on criminal appeal]; *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) [transcript for criminal appeal]. Although certain classifications based on wealth may be con-

sidered "suspect," the Supreme Court has explained that these earlier cases involved individuals or groups of individuals who shared two distinguishing characteristics: "because of their impecunity they were *completely unable to pay* for some desired benefit, and as a consequence, they sustained an *absolute deprivation* of a meaningful opportunity to enjoy that benefit." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 20, 93 S.Ct. 1278, 1289, 36 L.Ed.2d 16 (1973) (*emphasis added*). The *Rodriguez* Court upheld a Texas public school financing system which resulted in a greater "per pupil" budget in property-rich districts, explaining that "this Court has never heretofore held that wealth discrimination alone provides an adequate basis for invoking strict scrutiny," *id.* at 28–29, 93 S.Ct. at 1293–1294.

At least one indicator of a bona fide domiciliary intent identified by University officials, viz., ownership of a home or real property, may advantage the 'wealthier' student. But plaintiffs do not advance, nor would the evidence support, the argument that plaintiffs' impecunity rendered them *completely unable to* qualify for resident-student status, *see id.* at 20, 93 S.Ct. at 1289. Furthermore, home ownership is not a prerequisite to reclassification. Many nonhomeowning students, including the plaintiff Black, have been reclassified as residents in response to other reliable indicia of bona fide domiciliary intent.

■ Finally, it has not been shown or suggested that home ownership assures reclassification. Thus, even though home ownership may be considered a wealth-based indicator of domiciliary intent, a constitutionally "suspect" classification of nonresidents is not established.

The plaintiffs further argue that the Rules implicate their fundamental right to travel. *See, e.g., Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) [durational residency requirements for free medical care excessively burden right to travel]; *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) [improper restriction of voter

registration based on durational residency requirement]; *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) [durational residency requirement for welfare eligibility unjustifiably burdens right to interstate travel].

■ Plaintiffs misplace reliance on these cases in their attempt to demonstrate a constitutional connection between state post-secondary school tuition-rate residency classifications and the fundamental right to interstate travel. These cases

> concerned state limitations on the right of new residents to receive *basic necessities of life* (*Shapiro*—right to welfare assistance; *Maricopa*—right to medical care), or to exercise the *fundamental right* to vote (*Dunn*). The Court in *Shapiro* expressly left open the question of the validity of waiting periods or residence requirements in relation to eligibility for tuition—free education *Shapiro, supra,* 394 U.S. at 638 n. 21 [89 S.Ct. at 1333 n. 21]. . . .

*Montgomery v. Douglas,* 388 F.Supp. 1139, 1143 (D.Colo.1974) (*emphasis added*), *aff'd mem.,* 422 U.S. 1030, 95 S.Ct. 2645, 45 L.Ed.2d 687 (1975).

■ A state-subsidized, post-secondary education is not a fundamental constitutional right. *See Plyler v. Doe,* 457 U.S. 202, 221, 102 S.Ct. 2382, 2397, 72 L.Ed.2d 786 (1982) [no fundamental right to state-financed public education]; *accord San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 35, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973); *Hammond v. Marx,* 406 F.Supp. 853, 856 (D.Me.1975).

The Supreme Court recently refused to apply the "rational relationship" test in an equal protection challenge to a Texas statute withholding state funds for the education of illegal alien children. *Plyer v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (5–4). After acknowledging the existence of "a substantial 'shadow population' of illegal immigrants—numbering in the millions—within our borders" with illegal alien children being "special members of this underclass," 457 U.S. at 218, 102 S.Ct. at 2395, the Court selected an intermediate standard of scrutiny, requiring Texas to demonstrate a "substantial interest" in its discriminatory classification, *see Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Although the Court reiterated that public education is not a fundamental right, it concluded that complete denial of access to public education "imposes a lifetime of hardship on a discrete class of children not accountable for their disabling status[,] [and the] stigma of illiteracy." 457 U.S. at 223, 102 S.Ct. at 2398. The present case involves no such "discrete class" or unusual "hardship".

There being no "fundamental right" or "suspect class" implicated here, the appropriate "equal protection" test is whether the residency criteria bear a rational relationship to some legitimate state interest. *Lister v. Hoover,* 655 F.2d 123, 127 (7th Cir.1981); *Hooban v. Boling,* 503 F.2d 648, 650 (6th Cir.1974) (and cases cited therein). As the Supreme Court has explained—

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78 [31 S.Ct. 337, 340, 55 L.Ed. 369]. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 69–70 [33 S.Ct. 441, 443, 57 L.Ed. 730]. 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' *McGowan v. Maryland,* 366 U.S. 420, 426 [81 S.Ct. 1101, 1105, 6 L.Ed.2d 393].

*Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

The purpose of the Rules is to permit practicable administrative distinctions between students who are in Maine primarily

for the purpose of their education and students who are bona fide domiciliaries entitled to attend the University at the preferential tuition rate subsidized by Maine taxpayers.[2] In *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), which invalidated a Connecticut statute *irreversibly* classifying certain students, at the time of their admission, as "out-of-state" students, the Court nonetheless recognized that

> a State has a legitimate interest in protecting and preserving the quality of its colleges and universities and the right of its own bona fide residents to attend such institutions on a preferential tuition basis. . . . The State can establish such reasonable criteria for in-state status as to make virtually certain that students who are not, in fact, bona fide residents of the State, but who have come there solely for educational purposes, cannot take advantage of the in-state rates.

412 U.S. at 452–54, 93 S.Ct. at 2236–37.

### A. *Spouses of Maine Residents*

■ Plaintiffs challenge the "resident" status automatically accorded by the Rules to a nonresident student, male or female,[3] who marries a Maine resident. A similar provision has been said to "accord with valid state interests in granting resident tuition to dependents and family members of state residents." *Lister v. Hoover,* 655 F.2d 123, 128 (7th Cir.1981).

It seems reasonable to suppose that marriages between out-of-state students and Maine residents are not often arranged to buttress requests for tuition-rate reclassification. Furthermore, and as a general rule, it is not unreasonable to view marriage to a Maine resident as a significant indicator of the strength of one's ties to Maine, as opposed to another state, and thus as substantiation of a stated intention to remain in Maine indefinitely. Given the reasonableness of its predicate, this provision of the

Rules finds further rational foundation in its administrative convenience.

### B. *Exemption For Military Personnel & Dependents*

The establishment of in-state tuition rates for members of the armed forces on active duty in Maine and for their dependents is a reasonable attempt to further Maine's legitimate interest in supporting all United States citizens who serve their country in the military. The Rules contribute to the fabric of an informal interstate system of reciprocity which benefits Maine citizens serving in the military in other states. In discussing a similar provision, the Seventh Circuit concluded that "valid state interests [were] involved in all of the challenged exemptions." *Lister v. Hoover, supra,* 655 F.2d at 127 n. 7.

### C. *Home Ownership*

The plaintiffs argue that the Rules impermissibly discriminate against students who do not own real estate in Maine, particularly homes. Automatic reclassification is neither granted nor denied under the Rules, either on their face or as applied, on the basis of home ownership. At most, home ownership is considered significant corroborative evidence of intent to remain in Maine indefinitely.

■ Plaintiffs maintain that a factor such as home ownership may not be considered at all, because it is dependent, at least in part, upon "wealth". Plaintiffs have not demonstrated that consideration of home ownership implicates a fundamental right or a suspect classification. Thus, the consideration of home ownership as a significant indicator of bona fide domiciliary intent is permissible provided it is reasonable. *Dandridge v. Williams,* 397 U.S. at 485, 90 S.Ct. at 1161. The Court believes it reasonable for University officials, as a

---

**2.** "Nonresident" students pay tuition equal to the actual per-student cost of the University programs, while part of the "cost" of educating Maine residents is borne by the State of Maine.

**3.** Thus, the Court need not consider whether a stricter standard than the "rational relationship" test might be required. *Compare Samuel v. University of Pittsburgh,* 375 F.Supp. 1119 (W.D.Pa.1974).

general rule, to consider that a student who owns a home in Maine is more likely than his nonhomeowning-student counterpart to have formed the requisite intent to remain in Maine beyond graduation.

### D. *Initial Classification v. Reclassification*

As their final equal protection challenge, plaintiffs assert that a student claiming resident status at the time of admission to the University is subjected to a less rigorous standard than a student seeking reclassification after having been classified a nonresident.

It is not at all clear that a less rigorous classification standard is applied at the time of admission. The presumption of nonresidency applicable to out-of-state students enrolling in the University "for a full academic program" is not expressly rendered inapplicable to students claiming resident status at the time of admission. The instructions provided to applicants for admission to the School of Law [Joint Exhibit 1(c)] state that in order "to establish clearly the residency status of each student before registering" the University of Maine School of Law will apply the Rules governing residence. These instructions go on to quote the Rules verbatim. The fact that the student is asked to specify his state of residence on the application for admission does not mean that a claim of residence is accepted without question.

The plaintiffs point to an inter-office memorandum of the University of Maine School of Law stating that a student's residence is "based normally on that state which is given as state of residency by the applicant on the application form," Joint Exhibit 1(d), but the memorandum further states: "If there is a question regarding [residency] it is raised at an Admissions Committee meeting and finally decided upon there," *id.*

Students seeking reclassification must complete a questionnaire. Applicants for admission to the School of Law are also asked to explain the *basis* for claiming a Maine residence. The existence of differ-

ent information-gathering procedures does not mean that more or less scrutiny is given the information gathered.

■ Even if a satisfactory showing had been made that a less onerous burden of going forward with the evidence is imposed on those who claim a Maine residence *at the time of their admission* to the University, the Court would consider such a practice reasonable. Most students claiming to be Maine residents at the time of their initial application for admission are likely to do so on the basis of readily verifiable preadmission affiliations with Maine; whereas most students requesting reclassification as residents would have to rely upon postadmission affiliations with Maine, often mere incidents of their presence in Maine for the primary purpose of attending the University. Preadmission connections with Maine, on the other hand, are reasonably considered more reliable indicators of domiciliary intent, even without other corroborative evidence. Finally, scrutiny of the residency claim of every applicant for University admission would impose a much heavier administrative burden without commensurate improvement in the reliability of the decisionmaking results.

### *Due Process Claims*

Plaintiffs' due process challenge comprises three components. First, plaintiffs say that they were denied substantive due process in that the rejections of their requests for reclassification were "arbitrary and irrational" in light of the evidence and the reasons given. Second, they argue that the Rules, although purporting to permit rebuttal of the presumption of nonresidency, are applied in such a way by University officials that the presumption is in fact irrebuttable for "individuals such as Plaintiffs who are single and who do not own property in any state." Plaintiffs' Trial Brief at 8. Finally, plaintiffs assert that the requirement that a student seeking reclassification demonstrate that he has been a bona fide domiciliary of the state for the preceding calendar year violates the due process standards enunciated in *Vlandis v. Kline,*

412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973).

### A. Arbitrariness of Reclassification Decisions

The several administrative decisions refusing to reclassify plaintiffs as Maine residents are attacked as arbitrary and irrational. Plaintiffs point to their questionnaire responses, which are consistent with plaintiffs' assertions that they are Maine domiciliaries, and they cite the failure of University officials to assign specific reasons for refusing reclassification. Plaintiffs further complain that one of the reasons identified by a University official for refusing a requested reclassification reflects that consideration was given to an inappropriate factor. Finally, plaintiffs maintain that the decisions of the University officials must be deemed arbitrary in light of the "overwhelming" evidence presented.

"The touchstone of due process is protection of the individual against arbitrary action of government, *Dent v. West Virginia,* 129 U.S. 114, 123 [9 S.Ct. 231, 233, 32 L.Ed. 623] (1889)." *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974). Although constitutionally-adequate procedures govern the determination of entitlements to state-created benefits, it is a further requirement of substantive due process that decision makers may not act in a manner which is "wholly arbitrary or irrational," *Martinez v. California,* 444 U.S. 277, 282, 100 S.Ct. 553, 557, 62 L.Ed.2d 481 (1980). *See Kelley v. Johnson,* 425 U.S. 238, 248, 96 S.Ct. 1440, 1446, 47 L.Ed.2d 708 (1976); *Drown v. Portsmouth School District,* 451 F.2d 1106 (1st Cir.1971); *Martin v. Harrah Independent School District,* 579 F.2d 1192 (10th Cir.1978); *Kindem v. City of Alameda,* 502 F.Supp. 1108 (N.D. Calif.1980); *Beatham v. Manson,* 369

F.Supp. 783, 789–792 (D.Conn.1973). *Cf. Willens v. University of Massachusetts,* 570 F.2d 403, 406 (1st Cir.1978). As a matter of due process, officialdom may not preempt a constitutionally-protected interest by ignoring "well settled rules and understandings [or by] disregard[ing] facts. . . ." *Martin v. Harrah Independent School District, supra,* 579 F.2d at 1200. The reasons underlying a decision may not be "arbitrary or capricious;" that is, the decision may not be "wholly unsupported" by fact, and its rationale may not be either trivial or irrelevant. *See Drown v. Portsmouth School District, supra,* 451 F.2d at 1108. *See also Wishart v. McDonald,* 500 F.2d 1110, 1115 (1st Cir.1974); *Fisher v. Snyder,* 476 F.2d 375, 377 (8th Cir.1973). In order to establish that an administrative decision is so arbitrary as to amount to a denial of substantive due process "the plaintiffs must show that there is no rational basis for the . . . decision . . . or that the decision was motivated by bad faith or ill will. . . ." *Stevens v. Hunt,* 646 F.2d 1168, 1170 (6th Cir.1981) (citations omitted). *See also Stratford v. State-House Inc.,* 542 F.Supp. 1008, 1015–16 (E.D.Ky.1982) [substantial evidence is *not* required so long as decision is "supportable on any rational basis" and is not a result of "willful and unreasoning action, without consideration and in disregard of the facts"].

The state-created benefit presently at issue is a significantly reduced tuition rate.[4] Although a state university is not required to provide its "residents" with a lower tuition rate than "nonresidents," where a statutory or regulatory scheme purports to confer such a benefit to "bona fide domiciliaries," the due process clause is implicated. *See Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973).[5]

---

4. The relevant tuition differentials were as follows:

| | Academic Year | |
|---|---|---|
| | 1979–80 | 1980–81 |
| Nonresident | $2,980 | $3,190 |
| Resident | 1,250 | 1,450 |
| | $1,730 | $1,740 |

5. Like the plaintiffs in *Vlandis v. Kline,* these plaintiffs do not challenge the right of the state to differentiate between "residents" and "nonresidents" for tuition purposes.

*See also Logan v. Zimmerman Brush Company,* 455 U.S. 422, 432, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982); *Vitek v. Jones,* 445 U.S. 480, 490–91 n. 6, 100 S.Ct. 1254, 1262 n. 6, 63 L.Ed.2d 552 (1980).

The Rules provide that a nonresident student who enrolls in a full-time educational program at the University is presumed to be in Maine primarily for education and not as a bona fide domiciliary; "and the burden will be on the student to prove otherwise." (Appendix A). The Rules do not specify the kind or quantum of proof required to overcome the presumption.[6]

 As a general rule, due process requires that the discretion of the decision-maker be guided by suitable substantive and procedural standards. *See Raper v. Lucey,* 488 F.2d 748, 753 (1st Cir.1973); *Historic Green Springs, Inc. v. Bergland,* 497 F.Supp. 839, 854–57 (E.D.Va.1980). *See generally,* 2 K. Davis, *Administrative Law Treatise,* § 7:26 (2d ed. 1979). But the general rule must yield in circumstances like these, where the Rules are unspecific primarily because of the "nebulous" nature of the required administrative determination; that is, the bona fides of the expressed domiciliary intent of a full-time University student seeking a preferential tuition rate. *See Lister v. Hoover,* 655 F.2d 123, 125–26 (7th Cir.1981).

> The concept of domicile is subject to no formula, but rather depends on the facts of each case.... The relative weight given each objective factor is not capable of quantification. The question to be answered in each case is whether the student came to the State solely to attend school or whether he intends to make the State his home.

*Hooban v. Boling,* 503 F.2d 648, 652 (6th Cir.1974). *Cf. Sherrill v. Knight,* 569 F.2d 124, 130 (D.C.Cir.1977) [governmental interest in denying White House press passes for

security reasons "does not lend itself to detailed articulation of narrow and specific standards or precise identification of all the factors which may be taken into account"].

The Rules do identify certain circumstances which conclusively evidence a bona fide domiciliary intent; for example, marriage to a Maine resident. Furthermore, the questionnaire (Appendix B) submitted by all students seeking reclassification suggests a number of factors considered relevant in determining domiciliary intent, including ownership or rental of property in Maine, voter registration, motor vehicle registration, and payment of Maine income taxes.

The plaintiffs argue that their responses to all of these questions were consistent with their stated intentions to reside in Maine indefinitely, and inconsistent with an intention to reside in any other state. Therefore, plaintiffs insist that they are entitled to be reclassified even on the basis of the criteria prescribed by the University. However, "[t]he issue is one of intent and no catalogue of objective criteria could, in most circumstances, be conclusive or determinative." *Lister v. Hoover, supra,* 655 F.2d at 126.

> To accept [plaintiffs'] argument would require the University to reclassify as a resident every student who, after attending the University for a year, makes a self-serving declaration that he intends to reside in [the state] permanently and [who] performs a series of 'objective acts,' some of which are required by law and all of which are customarily done by some nonresident students who do not intend to remain in [the state] after graduation. This would, in effect, create a presumption that such a student is a bona fide ... resident, thus seriously jeopardizing the University's nonresident tuition program and consequently its entire financial structure.

---

**6.** University officials themselves recognize, and on at least one occasion have complained about, the difficulty of determining whether a

student has presented sufficient proof to overcome the presumption.

*Michelson v. Cox,* 476 F.Supp. 1315, 1320 (S.D.Iowa 1979).[7]

The Rules do not require that the various factors identified on the questionnaire be viewed by University officials as sufficient evidence of a bona fide domiciliary intent, and for good reason. Almost all of these indicia of domiciliary intent are readily established by students having no intention to remain in Maine beyond graduation. The reliability of any piece of circumstantial evidence of domiciliary intent turns to a great extent upon the readiness with which that evidence can be produced by domiciliaries and nondomiciliaries alike. Certain circumstantial evidence of domiciliary intent is appropriately considered either conclusive, because the game is simply not worth the candle, *e.g.,* marriage to a Maine resident,[8] or particularly persuasive, because its production for tuition-rate purposes is impracticable, *e.g.,* preadmission affiliations with Maine.

The plaintiffs assert that the unspecificness of the University's reasons for denying reclassification demonstrates arbitrary action. *See Raper v. Lucey,* 488 F.2d 748, 752–53 (1st Cir.1973). For the most part, the letters informing the plaintiffs of the denial of their reclassification requests summarily state: (1) that the evidence presented did not demonstrate that the student was "in the state for at least a year primarily as a permanent resident and not merely as a student;" and (2) that the student was considered "in Maine primarily for education purposes." Letters from defendant Sullivan cite the lack of sufficient "external factual evidence" of intent to remain in Maine after graduation.

The plaintiffs argue that due process requires the University to assign more detailed reasons, including some indication as to what objective indicators of a bona fide domiciliary intent *would* be considered sufficient. *Compare Raper v. Lucey, supra,* 488 F.2d at 753 [government had not "advanced any appropriate interest that would be served by its refusal to detail reasons"].

The University's rejections of these reclassification requests made clear that plaintiffs had not overcome the presumption of nonresidency. The Rules and the questionnaire identify certain circumstantial evidence considered relevant to the purpose of the administrative inquiry. What they do not do is provide a pro forma list for use by students shopping for evidence of their intention to remain in Maine, which could only impede the decisionmaking process; the more perfunctory the proof, the less its probative value. Exhaustive detailing of the reasons for denying reclassification would be of dubious value in view of the highly subjective nature of the subject matter under inquiry.

Plaintiffs further suggest that the University was obliged to grant reclassification or else point to specific evidence rebutting their declarations of intent to reside in Maine after graduation. The Court cannot agree. The Rules establish a presumption that plaintiffs were in Maine primarily for educational purposes; the burden of proving otherwise is on plaintiffs.

Plaintiffs insist that the defendant Sullivan gave consideration to an inappropriate factor in rejecting their reclassification requests for the 1979–80 academic year. Sullivan informed plaintiffs that he had taken into account the fact that plaintiffs had

---

**7.** Nonresident tuition receipts annually account for approximately 25–28% of all tuition receipts at the University and about 10% of the University's total income. If the differential between resident and nonresident tuitions were abolished or if the nonresident rate could be avoided by perfunctory compliance with a prescribed list of evidentiary requirements, the resulting $8,000,000 revenue loss could only be made up through increased legislative appropriations or an increase in the resident tuition rate.

**8.** The Court is of the opinion that the preferential tuition-rate treatment accorded Maine-stationed armed forces personnel and their dependents results from a policy determination that such individuals should be accorded preferential tuition treatment as *nonresidents,* rather than that military personnel and their dependents possess the requisite domiciliary intent.

applied to non-Maine law schools and therefore had not demonstrated any "specific affiliation with Maine prior to . . . coming to law school here," see Joint Exhibit 1(m). The Rules provide that "a student does not acquire a domicile in Maine until he or she has been here for at least a year primarily as a permanent resident and not merely as a student." The absence of any preadmission affiliation with Maine is a relevant consideration in determining whether a student is or has been in Maine primarily as a permanent resident (and, if so, for how long) or primarily as a student.

■ The defendants' decisions denying reclassification were not arbitrary on the evidence submitted by plaintiffs. Both plaintiffs were residents of states other than Maine prior to their admission to the University. Neither plaintiff decided to come to Maine until after admission to the University. Both considered attending law schools outside of Maine. Gildard stated that he had formed the requisite domiciliary intent upon arrival at the University. Black claims to have decided to reside indefinitely in Maine in the spring of 1979.[9] In support of their 1979–80 school-year reclassification requests, plaintiffs offered evidence of Maine voter registration, Maine driver's license, summer work-study employment, year-round occupancy of Maine apartments, and statements of their intention to remain in Maine beyond graduation.

In their reclassification requests for the 1980–81 school year, the plaintiffs elaborated on their residential history and their reasons for deciding to become permanent residents of Maine, pointing to (1) more recent part-time and summer work-study employment in Maine, and (2) participation or membership in local organizations.[10]

■ The constitutional question raised by plaintiffs' substantive due process claim is not whether the University's decision was unwise, but whether it was "so irrational that it may be branded as 'arbitrary'," see Kelley v. Johnson, 425 U.S. 238, 248, 96 S.Ct. 1440, 1446, 47 L.Ed.2d 708 (1976). In light of the presumption of nonresidency and the clear absence of persuasive proof sufficient to meet the burden of establishing a bona fide intention to remain in Maine after their graduation, University officials did not act arbitrarily. See Vlandis v. Kline, 412 U.S. at 454–55, 93 S.Ct. at 2237–38 [State is entitled to "make virtually certain that students who are not, in fact, bona fide residents of the State, but who have come there solely for educational purposes, cannot take advantage of the in-state rates"].

The Rules are written and applied to impede preferential tuition-rate treatment of out-of-state students, unless the student is in Maine "primarily as a permanent resident and not merely as a student;" a legitimate state interest, see Vlandis v. Kline, 412 U.S. at 454–55, 93 S.Ct. at 2237–38. Due to the paucity of persuasive evidence supporting plaintiffs' statements of domiciliary intent, defendants refused reclassification, no doubt because whatever extrinsic evidence there was could just as easily have been presented by a student who did not intend to reside in Maine after graduation.[11] The Court concludes that no defendant acted arbitrarily in determining that plaintiffs failed to rebut the presumption of nonresidency.

#### B. Irrebuttable Presumption

The plaintiffs maintain that although the Rules themselves provide that a full-time student may attempt to overcome the presumption that he is in Maine primarily for purposes of education, the proof required to overcome that presumption is unattainable

---

**9.** Black's trial testimony concerning when she formed the requisite intent to reside in Maine appears inconsistent with her earlier statement to Fridinger, in a letter of September 6, 1979: "[W]hen I arrived in September of 1978 it was with the intent to abandon New Jersey as my old residence in favor of Maine as my new one." Joint Exhibit 1(k) at 3.

**10.** Gildard joined a local church and a Maine amateur athletic association. Black participated in a political party caucus and regularly donated blood through the Red Cross.

**11.** See, e.g., note 10 supra.

by "individuals such as Plaintiffs who are single and who do not own property in any state." They argue that this amounts to a *de facto* irrebuttable presumption in contravention of *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973).

In *Vlandis,* the Court held unconstitutional a Connecticut statute which permanently classified students as nonresidents for tuition purposes on the basis of their legal address at the time of application to the university.

> [I]t is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of nonresidence, when that presumption is not necessarily or universally true in fact, and when the State has reasonable alternative means for making the crucial evaluation.

412 U.S. at 452, 93 S.Ct. at 2236. Yet the Court suggested that there would be no due-process clause infirmity if, following one year of residence, students are given the opportunity to establish that they are bona fide domiciliaries. *Id.* at 452–53 n. 9, 93 S.Ct. at 2236–37 n. 9. Thus, *Vlandis* reaffirmed its disfavor of statutes which erect irrebuttable presumptions that are neither necessary nor sound in all circumstances, thereby precluding individualized determinations of the relevant facts.

The *Vlandis* "irrebuttable presumption" analysis has been described as a "strange hybrid of due process and equal protection scrutiny." Note, *The Irrebuttable Presumption Doctrine in the Supreme Court,* 87 Harv.L.Rev. 1534, 1548 (1974). In *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), for example, the Court held invalid under the equal protection clause a statute which established an irrebuttable presumption that unwed fathers are not fit parents; whereas in *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), school board regulations requiring all pregnant teachers to take unpaid maternity leave during a prescribed period prior to an expected birth were held violative of due process.

Plaintiffs' contention that the admittedly difficult burden of proof imposed on nonresident students seeking reclassification constitutes an irrebuttable presumption is flawed in several significant respects. First, cases invalidating irrebuttable presumptions have done so in the context of a statute, *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63, *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551, a regulation, *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52, or a constitutional provision, *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), applicable to an identifiable class of persons designated therein. *Coleman v. Darden,* 595 F.2d 533, 537 (10th Cir.), *cert. denied,* 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979). It is not at all clear that "persons in the same situation as the Plaintiffs" (Plaintiff's Trial Brief at 7) constitute an "identifiable" class. Assuming that an identifiable class is established however, the Rules on their face do not exclude such persons, as a class, from reclassification. Although marriage to a Maine resident will result in reclassification, the Rules neither definitively nor exclusively entitle either married or Maine-property owning students to reclassification. Although the Rules do accord automatic reclassification to certain categories of students, it does not follow that students outside of those categories are precluded from showing that they are bona fide domiciliaries.

Furthermore, the plaintiffs have not established that University officials, in applying the Rules, exclude unmarried, nonproperty-owning students from reclassification as Maine residents. Due process requires only that a student be granted a "fair opportunity" to demonstrate entitlement to reclassification. *See Vlandis v. Kline,* 412 U.S. at 446, 93 S.Ct. at 2233. Despite the fact that plaintiffs were nonresidents prior to becoming full-time students at the University, they were given ample opportunity to persuade University officials that they were not in Maine for the primary purpose of attending the Law School. The defend-

ants received and considered extensive written and oral information from the plaintiffs and conducted what was essentially a *de novo* review at each of the three levels of administrative review.

Not only have the plaintiffs failed to establish that an irrebuttable presumption was applied to unmarried, nonproperty-owning students, the evidence here presented by the defendants, including the ultimate reclassification of plaintiff Black,[12] gainsays the existence of any conclusive rule or policy applicable to such students. Clearly, nonresident students in certain circumstances may find it much easier to demonstrate an entitlement to reclassification than do certain other nonresident students. However, the fact that University officials find such circumstances as marriage, property ownership and preadmission affiliations with Maine highly probative of a bona fide domiciliary intent does not establish the existence of an irrebuttable presumption.[13]

*The Prerequisite One-Year Domicile*

Plaintiffs' final argument is directed to the following provision in the Rules.

> No student once having registered as an out-of-state student is eligible for resident classification in the University, or in any college thereof, unless he or she has been a bona fide domiciliary of the State for at least a year immediately prior to registration for the term for which resident status is claimed. . . . For University purposes, a student does not acquire a domicile in Maine until he or she has been here for at least a year primarily as a permanent resident and not merely as a student. . . .

Plaintiffs maintain that this provision indicates that it is not sufficient that a student establish that he or she is a bona fide domiciliary at the time of application for reclassification. The student must also demonstrate that he or she has been a bona fide domiciliary during the preceding year.

This particular provision is not unique to the University of Maine. An almost identical University of Minnesota requirement was challenged before a three-judge district court in *Starns v. Malkerson,* 326 F.Supp. 234 (D.Minn.1970), *aff'd mem.,* 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971). *See also Michelson v. Cox,* 476 F.Supp. 1315, 1319 (S.D.Iowa 1979). The district court interpreted the provision as follows: "The effect of this regulation is to impose on any person moving into the State a one year *durational residency requirement* to qualify as a resident for tuition purposes at the University." 326 F.Supp. at 235 (*emphasis added*). The court then framed the issue as being "whether it is constitutionally permissible for a state to create an irrebuttable presumption that any person who has not continuously resided in Minnesota for one year immediately before his entrance to the University is a nonresident for tuition purposes," *id.* at 237, and referred to this minimum requirement as a "one-year waiting period," *id.* at 239. The University of Minnesota offered as the primary justification for the "waiting period" the state's interest in achieving "partial cost equalization" through "contribution, tangible or intangible, towards the State's welfare for a period of twelve months." *Id.* at 240–41. Accepting this rationale as valid and sufficient, the court concluded that "the regulation requiring one-year domicile within the

---

**12.** The Court is aware of the possibility that plaintiff Black's reclassification may have been influenced, in part, by the pendency of these proceedings. However, the essential rationale for her reclassification, a demonstrated commitment to post-graduate employment in Maine, appears sound. *But cf. Kelm v. Carlson,* 473 F.2d 1267 (6th Cir.1973) [requirement of definite commitment to in-state, post-graduate employment as a *prerequisite* to reclassification violates equal protection clause]. Moreover, other instances of reclassification cited by University officials indicate that reclassifica-

tion is not perfunctory, but sometimes turns on a number of factors, including factors not advanced by the student.

**13.** Carried to its logical extreme plaintiffs' argument would preclude the use by University officials of standard, objective indicia of bona fide domiciliary intent, because, in plaintiffs' view, the use of such criteria would mean that an irrebuttable presumption was being applied to those students *not* positioned to meet those particular criteria.

State to acquire resident classification for tuition purposes at the University is constitutionally valid." *Id.* at 241. The United States Supreme Court affirmed without opinion. 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527.

Two years later, in *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), the Supreme Court commented on its affirmance of *Starns:*

> Under the regulation involved in *Starns,* a student who applied to the University from out of State could rebut the presumption of nonresidency, after having lived in the State for one year, by presenting sufficient evidence to show bona fide domicile within Minnesota. In other words, residence within the State for one year, whether or not in student status, was merely one element which Minnesota required to demonstrate bona fide domicile.

*Id.* at 452–53 n. 9, 93 S.Ct. at 2236–37 n. 9. Also, in striking down a Connecticut statute which prevented students coming from another state from establishing at any time that they were bona fide residents, the *Vlandis* majority noted:

> But even if we accepted the State's argument that its statutory scheme operates to apportion tuition on the basis of old and new residency, that justification would give rise to grave problems under the Equal Protection Clause of the Fourteenth Amendment.

*Id.* at 450 n. 6, 93 S.Ct. at 2235 n. 6.

Apparently recognizing a distinction between a state's attempt to discriminate against new bona fide residents and the Minnesota minimum waiting period in *Starns,*[14] the Court warned that its decision in *Vlandis* should not be "construed to deny a state the right to impose on a student, as one element in demonstrating bona fide residence, a reasonable duration residency requirement, which can be met while in student status." *Id.* at 452, 93 S.Ct. at 2236.

It is this proviso in *Vlandis* upon which the University of Maine relies in support of the constitutionality of its requirement that a student be a *bona fide domiciliary* for at least one year, before he or she is entitled to reclassification. However, the interpretation given to the Minnesota regulation by the district court in *Starns* and apparently relied on by the Supreme Court does not clearly follow from the above-quoted language. Therefore, it is necessary to consider the meaning of the Maine provision, both as it appears on its face and as it has been interpreted by University officials, before the Court can determine whether *Starns* is controlling.

The Rules employ the terms "domicile" and "residence," as to the meaning of which the following discussion by the Maine Law Court is instructive:

> Domicile is a somewhat elusive concept which often is confused with the related yet separate concept of 'residence.' A principal distinction between the two is captured in the frequent observation that a person can have more than one residence but only one domicile. . . . Domicile has two components: residence and the intention to remain. When these occur there is domicile.

*Margani v. Sanders,* 453 A.2d 501, 503 (Me. 1982). Indeed, a close analysis of the Rules indicates that the word "domicile" is used to refer not merely to a place of abode, i.e., a residence, but to a *status.* The Rules provide in particular that "a student does not acquire a domicile in Maine until he or she has been here for at least a year primarily as a permanent resident and not merely as a student. . . ." Moreover, the object of evaluating requests for reclassification under the Rules is to determine whether a student is a "bona fide domiciliary" of Maine.

The Court cannot conclude, consistent with their language, that these Rules merely impose a one-year "durational residency re-

---

14. This distinction seems not to have been accepted by two members of the *Vlandis* majority, who expressed doubt as to the validity of the Court's summary affirmance in *Starns* un-

der the equal protection clause. 412 U.S. at 455, 93 S.Ct. at 2238 (Marshall, J. and Brennan, J., concurring).

quirement," that is, a requirement that the student have "lived in the State for one year, ... [in order] to demonstrate bona fide domicile," *Vlandis v. Kline,* 412 U.S. at 452–53 n. 9, 93 S.Ct. at 2236–37 n. 9, because the Rules expressly require that the student be a *bona fide domiciliary* for one year prior to being entitled to reclassification.[15]

Not only does this appear to be the clear import of the one-year bona fide domicile requirement, the University officials have in fact interpreted this Rules provision as requiring a decision on their part, not only as to whether a student requesting reclassification is presently a bona fide domiciliary, but also whether he has been one for a year prior to the time of the determination. A student reclassified in accordance with this requirement is thus impliedly determined to have been a bona fide domiciliary for the entire preceding year. However, there is no formal or informal provision for according practical, retroactive effect to any such decision, as by refunding the tuition differential for the preceding one-year domiciliary period. Indeed, the Rules specifically provide that "[a]ll changes approved during a semester will be effective the beginning of the next semester; none are retroactive."

In *Montgomery v. Douglas,* 388 F.Supp. 1139 (D.Colo.1974), the district court, relying on *Starns* and *Vlandis,* upheld, against similar attack, a Colorado statute defining in-state students as those "domiciled in Colorado for one year or more immediately preceding registration ... for any term or session for which domiciliary classification is claimed." *Id.* at 1140. In the face of plaintiffs' argument that *Vlandis* only endorses a one-year durational residency requirement as a means of demonstrating bona fide domicile, the Colorado court concluded that the Supreme Court's reference to *bona fide* domicile indicated that Colorado's requirement of a one-year domicile may be viewed, consistent with *Vlandis,* "as an element the state could consider in determining *bona fide* domicile," *id.* at 1143. The *Montgomery* reasoning is not particularly persuasive in light of the fact that the relevant Colorado statute defined domicile as "a person's *true,* fixed, and permanent home and place of habitation," *id.* at 1140 (*emphasis added*), thus suggesting an element of good-faith in the use of the term "domicile." Moreover, the University of Maine durational residency requirement specifically requires that a student be a *bona fide domiciliary* for a year.

In a more recent decision involving a University of Iowa regulation requiring a student to establish a "bona fide residence in the state for at least 12 months immediately preceding the beginning of the semester," *Michelson v. Cox,* 476 F.Supp. 1315, 1319 (S.D.Iowa 1979), the court, relying on the Supreme Court's summary affirmance of *Starns,* concluded that the Iowa regulation was substantially the same on its face as the one in *Starns,* and was, therefore, constitutional. *Id.* at 1319. The court did not discuss the significance of the Supreme Court's elaboration, in *Vlandis,* 412 U.S. at 452–53 n. 9, 93 S.Ct. at 2236–37, n. 9, of the basis for its summary affirmance of *Starns.*

■ As this Court has previously recognized, although a summary affirmance is a disposition on the merits, " '[b]ecause a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below.' " *Bangor Baptist Church v. State of Maine,* 549 F.Supp. 1208, 1219 (D.Me.1982), *quoting Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) (*per curiam*). Indeed, the rationale pointed to by the *Starns* court in upholding the validity of its durational residency requirement, i.e., the state's right

---

**15.** This provision, together with the requirement that a student must have "been here" for at least a year as a permanent resident in order to be deemed to have "acquired a domicile," could conceivably result in a total waiting period of two years before being eligible for the resident tuition rate, even though, when the student first came to the University, he was in fact a bona fide domiciliary, in the legal sense, i.e., a resident having the intention to remain indefinitely.

to exact "some contribution, tangible or intangible" prior to according state benefits, 234 F.Supp. at 241, has been rejected, as not being a legitimate state purpose, in Supreme Court decisions both before and since the summary affirmance of *Starns. See Zobel v. Williams,* 457 U.S. 55, 61–63, 102 S.Ct. 2309, 2313–14, 72 L.Ed.2d 672 (1982); *Shapiro v. Thompson,* 394 U.S. 618, 632–37, 89 S.Ct. 1322, 1330–33, 22 L.Ed.2d 600 (1969). Moreover, the discussion of *Starns* in *Vlandis* provides an unusual insight into the reasons behind the Supreme Court's summary affirmance of *Starns.* And that discussion, in addition to the misgivings about *Starns* expressed by two members of the *Vlandis* majority, 412 U.S. at 455, 93 S.Ct. at 2237 (Marshall, J. concurring), indicates that while the Supreme Court has approved of a limited durational residency requirement as a means of demonstrating the bona fides of a student's claim of domiciliary status, it has not approved of statutes or regulations which distinguish between *old* bona fide domiciliaries and *new* bona fide domiciliaries, *see Vlandis,* 412 U.S. at 450 n. 6, 93 S.Ct. at 2235 n. 6, which the University of Maine Rules, on their face and as applied by University officials, clearly do.

The Supreme Court recently considered a similar equal protection argument in an analogous context in *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (8–1). *Zobel* involved an Alaska plan for distributing to residents windfall earnings flowing from the discovery of oil reserves on state-owned lands. The dividend distribution plan, while imposing no waiting period as a prerequisite to eligibility for dividends, nevertheless distinguished between old and new residents by making the size of each resident's dividend dependent on the number of years the recipient had been a resident of Alaska. Concluding that the scheme did not even pass the minimum "rationality" test, the Court held that the distinctions drawn between old and new bona fide residents violated the Equal Protection Clause of the Fourteenth Amendment.

The relevance of *Zobel* in the context of the present case is indicated by the following passage from *Zobel:* "Similarly in *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), we noted that 'apportion[ment] of tuition rates on the basis of old and new residency . . . would give rise to grave problems under the Equal Protection Clause of the Fourteenth Amendment.' 412 U.S., at 449–450 and n. 6 [93 S.Ct. at 2235 and n. 6]." 102 S.Ct. at 2314. Moreover, the text of the *Zobel* decision, adopted by seven members of the eight-justice majority, specifically referred to its summary affirmance of *Starns,* as follows:

[*Starns*] cannot be read as contrary to the decision of this Court. First, summary affirmance by this Court is not to be read as an adoption of the reasoning supporting the judgment under review . . . . Moreover, as we pointed out in [*Vlandis*], we considered the Minnesota one-year residency requirement examined in *Starns* a test of *bona fide* residence, not a return on prior contributions to the commonweal.

102 S.Ct. at 2315 n. 13 (citations omitted) (emphasis in original).

Following the analysis in *Zobel,* it is first necessary to consider whether the University Rules merely establish a "durational residency requirement . . . to assure that only persons who [have] established *bona fide* residence receive[ ] rights and benefits provided for residents," or whether they create "fixed, permanent distinctions between . . . concededly *bona fide* residents, based on how long they have been in the State." 102 S.Ct. at 2312.

With some exceptions, the Rules preclude reclassification unless a student has been a "bona fide domiciliary of the State for at least a year prior to . . . the term for which resident status is claimed." A student is not deemed to have acquired a "domicile in Maine until he or she has been here for at least a year primarily as a permanent resident and not merely as a student." Although the latter provision may be viewed as a minimum waiting period, the former appears to be something more.

The testimony of University Treasurer William Sullivan concerning the reclassification of plaintiff Black indicates that, as a prerequisite to according her resident status for her final semester at the Law School, he had to determine that she *had acquired* the necessary domiciliary intent at least one year prior thereto, that is, prior to the beginning of the second semester of her second year. There was no question that Black had lived in Maine for more than two years prior to the second semester of her final year. Therefore, it is obvious that any one-year waiting period would have been satisfied at that time, and there would have been no need to consider anything beyond whether, in light of all of the evidence, including the duration of her residence in Maine, she· was a bona fide *domiciliary* of Maine *at that time.*

In other words, the Rules do not accord resident tuition status to *all* bona fide domiciliaries who have met the minimum requirement of having lived in Maine for one year. Rather, on their face and as applied by University officials the Rules distinguish between new bona fide domiciliaries and those who have held that status for a year, with only the latter being immediately entitled to resident tuition rate status. This distinction is one of substance as well as form, as indicated by Sullivan's testimony in response to a hypothetical question posed at trial. He confirmed that a law student, who, just prior to his third and final year, persuades University officials on overwhelming evidence that he has *at that point* formed the requisite intent to remain in Maine indefinitely, would not, without more, qualify for the resident-tuition rate for his final year at the Law School; and, because the Rules do not permit retroactive adjustments, such a student would never benefit from having been a bona fide domiciliary during his final year.

Having concluded that the Rules distinguish between bona fide domiciliaries, construing that term to mean persons having the requisite intent to remain in Maine indefinitely, on the basis of how long they have held that status, it is necessary to consider whether, as a minimum, there is a rational state interest supporting such a distinction, that is, whether "the classification has some reasonable basis," *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

The University, through Treasurer Sullivan, advanced two reasons for the requirement of a one-year domicile: (1) the likelihood that "someone who had been here as a domicile (sic) for 12 months or more would have made more contributions [in that time] in the average case than someone who was simply a resident," Transcript at 224; and (2) the added "assurance [to the fact finder] that the domiciliary intent has been formed," Transcript at 215.

As the defendants have recognized in their post-trial brief, the Supreme Court has rejected the "past contribution" rationale as a proper state purpose. *Zobel v. Williams,* 102 S.Ct. at 2314. Therefore, the first reason offered by the University, recognition of "contributions of various kinds, both tangible and intangible," *id.* at 2313, generally made during a 12-month period by domiciliaries as opposed to mere residents, is not a legitimate state purpose.

With respect to the second suggested rationale, the University defendants, in their post-trial brief, rely on the right of the state to ensure that only bona fide residents attend state institutions on a preferential tuition basis. *See Vlandis v. Kline,* 412 U.S. at 453, 93 S.Ct. at 2237. The University characterizes a one-year domicile as further evidence that the student is indeed a bona fide domiciliary. But a determination by University officials that a student is in fact a bona fide domiciliary at any particular point in time necessarily presupposes that there has already been sufficient corroboration of domiciliary intent. The prerequisite one-year domicile appears to accomplish nothing more than to deny resident-tuition rate status for the preceding one-year period to students the University has already determined, under its own rigorous standards, to be bona fide domiciliaries; that is, students intending to remain in Maine indefinitely. In light of the substantial dis-

cretion which University officials have in deciding whether or not a student has established a bona fide domicile at the time of the request for reclassification, any further "assurance" provided by such a requirement is unnecessary.[16]

■ The University's resident tuition policy is designed to provide Maine residents with a kind of educational subsidy, while requiring nonresidents to bear the full cost of their University education. The Rules, in the defendants' view, are designed to ensure that only bona fide domiciliaries receive the preferential tuition rate. In the Court's view, the requirement of a one-year domicile as a prerequisite to reclassification bears no rational relationship to this policy and purpose.[17]

The constitutional infirmity in the provision under consideration is pointed up by the warning in *Vlandis* (reiterated in *Zobel*) that "to apportion tuition rates on the basis of old and new residency ... would give rise to grave problems under the Equal Protection Clause of the Fourteenth Amendment," 412 U.S. at 449–450 and n. 6, 93 S.Ct. at 2235 and n. 6. As a qualification of this statement, *Vlandis,* in *dictum,* noted that a "reasonable durational residency requirement, which can be met while in stu-

dent status" may be proper. 412 U.S. at 452, 93 S.Ct. at 2236. It is on the basis of this dictum that the University defendants seek to justify the requirement of a one-year domicile.

Their reliance on *Zobel* and *Vlandis* reveals that defendants misconceive the nature of the "durational residency requirement" approved in those cases. The Supreme Court *dictum* in *Vlandis* approved "durational residency requirements" which mandate that a student *"live in"* a state for one year as "one element" in establishing "bona fide domicile." *Vlandis v. Kline,* 412 U.S. at 452–53 n. 9, 93 S.Ct. at 2236–37 n. 9. The Court did not approve a requirement that a student have been a bona fide *domiciliary* for one year in order to qualify for the in-state tuition rate.

Assuming that a mere durational residency requirement is constitutional, the University's minimum requirement of a one-year domicile bears no rational relationship to the general purpose served by the Rules. Since this requirement also discriminates between bona fide domiciliaries on the basis of whether or not they acquired their domiciliary status more or less than one year previous, it is violative of the Equal Protection Clause of the Fourteenth Amendment.

---

16. This is not to say that this requirement is without significance. The absence of such a requirement likely would not change the result in many cases, because the focus of University officials would merely shift, from a consideration of the length of time a student had had the requisite domiciliary intent, to a consideration of whether, in light of durational factors, the student *had had* the requisite domiciliary intent by the time of his request for reclassification. However, by focusing primarily on the state of mind of the student at the time of his request, there would be less risk that University officials would deny resident tuition rate status purely on the basis of the recentness of particular events, such as employment commitments, rather than on the evidentiary significance of those events. Moreover, there are some cases in which the result would clearly change, such as the case of the aforementioned hypothetical law student who prior to his third year satisfactorily establishes that he was indeed a bona fide domiciliary at the time of his application, but whose request for reclassification is denied because *preapplication events* do not indicate

that he *then* had the requisite domiciliary intent.

17. Treasurer Sullivan's *initial* response to the Court's inquiry as to the purpose served by the requirement of a one-year domicile, as opposed to a one-year durational residency, bears repeating:

THE COURT: [W]hat additional policy or state interest, University interest, is served by ... having a domiciliary requirement for one year, as opposed to a mere residency requirement? If you're satisfied, in our hypothetical, that on the beginning of the second year.... this person is in fact domiciled in Maine, and now, on the basis of that, coupled with the fact ... they've lived here for a year, I feel they have the requisite intention, plus the physical presence, what public policy or state interest is served by one of those as opposed to the other?

THE WITNESS: I can't say that there is any difference in public purpose served in that situation.

## DAMAGES

In addition to declaratory and injunctive relief,[18] the complaint seeks damages based on the following tuition differentials for the years in question:

| | Academic Year | | |
| | 1979–80 | 1980–81 | Total |
| --- | --- | --- | --- |
| Black | $1,730 | $ 870 (in escrow for second semester) | $2,600 |
| Gildard | $1,730 | $1,740 (in escrow for both semesters) | $3,470 |
| | | | $6,070 |

■ Although the Court has concluded that plaintiffs' constitutional rights were violated by the particular provision in the Rules imposing the requirement of a bona fide one-year domicile as a prerequisite to eligibility for reclassification, plaintiffs are not entitled to other than nominal damages, absent a showing of actual injury resulting from the constitutional violation. *See Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

From the testimony of the University officials it does not appear that plaintiff Gildard would have fared any better in his requests for reclassification if the Rules had not imposed the aforementioned requirement. According to University officials, Gildard's reclassification requests were denied each year because he had not *yet* supplied sufficient corroboration of his stated intention to remain indefinitely in Maine.[19] Gildard does not claim that he omitted any evidence from his reclassification requests because he believed that under the Rules the newness of such evidence would make it irrelevant to the reclassification determination for the particular semester in question. Therefore, the Court concludes that Gildard has not shown that he suffered any actual damages as a result of defendants' violation of his rights.

Plaintiff Black's situation differs in one important respect. Black was reclassified as a resident for tuition purposes for her final semester, which necessarily presupposed a determination that she had been a bona fide domiciliary for at least one year prior thereto. Shortly after the denial of her reclassification request for the fall semester of 1980 by Treasurer Sullivan on October 6, 1980, Black requested reconsideration of Sullivan's decision in light of her acceptance of an offer of employment she had received on October 14, 1980 to serve as law clerk to a Maine judge following her graduation. But rather than reconsidering the 1980 fall-semester reclassification request as Black had asked, University officials instructed Black to request reclassification for the 1981 spring semester. Defendant Sullivan refused to reconsider Black's 1980 fall semester status because the new evidence of her domiciliary intent had not come to light until after the rejection of her fall-semester reclassification request. But according to Sullivan it was determined in May, 1981 that Black had first acquired the requisite domiciliary intent at the time she *applied* for the law clerk position, one year prior to the 1981 spring semester.

According to Black, during the course of the evaluation of her 1980 fall-semester reclassification request University officials were made aware of the fact that she had *applied* for employment in Maine following graduation. Her *acceptance* of Maine employment gave new and greater significance to this evidence, according to Sullivan. However, but for the *one-year domicile* requirement, it seems likely that the evidence that Black had *applied* for postgraduation employment in Maine might have been considered highly probative of an intent (formulated no later than the spring of 1980) to reside indefinitely in Maine. Had the Rules focused on Black's domiciliary intent at the time of her 1980 fall-semester reclassification request, her *applica-*

---

18. The request for injunctive relief preventing defendants from requiring plaintiffs to pay nonresident tuition for their 1980–81 academic year has been mooted by the parties' stipulation placing the tuition differential for that year in escrow.

19. The letters denying his requests similarly indicate that each University official concluded that Gildard was not yet a Maine domiciliary, that is, a permanent resident.

*tion* for Maine employment in early 1980 would have had a direct bearing on *that* request. Had Sullivan considered Black's *acceptance* of the offer of Maine employment as probative of *present* domiciliary intent alone, this new evidence would have been irrelevant to Black's 1980 fall-semester reclassification request, regardless of the one-year *domicile* requirement. But Sullivan concluded that this "new evidence" established that the requisite domiciliary intent had been formed in January, 1980 when Black *applied* for Maine employment.

Sullivan's refusal to reconsider his October 6 denial of Black's 1980 fall-semester reclassification request, even though the employment offer was accepted by Black a mere eight days later, on October 14, 1980, was attributed solely to the tardiness of the submission of the new evidence.[20] Under the existing Rules, evidence of nothing less than a domiciliary intent formed at least one year prior to the commencement of the 1980 fall semester would have been required in order to sustain the 1980 fall-semester reclassification request. In view of Sullivan's opinion that Black's 1980 fall-semester reclassification request "was a close case to begin with," Transcript at 163, and his retrospective observation that he had "made a mistake in classifying Ms. Black originally," *id.,* the Court is satisfied that Sullivan would not have refused to reconsider his October 6 decision in light of evidence of *acceptance* of Maine employment, if Black's domiciliary intent *at the time of her 1980 fall-reclassification request,* rather than a year prior thereto, had been the key to reclassification under the Rules.

The Court concludes that, but for the unconstitutional one-year domicile requirement, evidence of her Maine employment *application,* which evidence was presented to Sullivan in the fall of 1980, would have resulted in her reclassification as a resident during the 1980 fall semester, as well as during the ensuing spring semester of 1981. Therefore, as a result of this unconstitutional regulatory provision Black was wrongfully denied in-state tuition rate status for the 1980 fall semester, which resulted in an $870 tuition overcharge.

*Immunity*

█ Both the University and the individual defendants have raised various immunity defenses upon which decision has been deferred pending trial on the merits. The University asserts Eleventh Amendment sovereign immunity as a defense against either injunctive or monetary relief. *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (*per curiam*); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). No injunctive relief against the University is presently requested. With respect to her claims for retrospective damages, the Court has concluded that plaintiff Black is entitled to $870 (and interest), the tuition differential for the 1980 fall semester. The present action was filed prior to the 1980 fall-semester reclassification decisions, and preliminary injunctive relief was requested. In order to avoid the need for a determination of the propriety of such relief, the plaintiffs deposited the tuition differential for the 1980–81 academic year in an escrow account with the Clerk of Court. If the plaintiffs prevail on their claim that they

---

**20.** The University defendants have pointed to no absolute regulatory bar preventing Sullivan from reconsidering, during the same semester, his decision with respect to Black's fall-semester reclassification request. Indeed, there is no prescribed schedule governing consideration of student appeals and no time restriction on the presentation of evidence; "final" denials sometimes come as late as the middle of the following semester. According to University officials, at each level of administrative appeal students may present new evidence of compliance with the requirements of the Rules. Thus, the provision in the Rules that "[a]ll changes

approved during a semester will be effective the beginning of next semester [and that] none are retroactive" has not been applied to preclude consideration of new evidence bearing on the residency qualifications a student possessed at the time of a request for reclassification at the beginning of the semester.

During the 1980 fall semester Black requested that her acceptance of Maine employment should be viewed as warranting reconsideration of her 1980 fall-semester reclassification request. She did not merely offer this evidence in support of her yet-to-be-filed reclassification request for the 1981 spring semester.

should not have been required to pay non-resident tuition for the 1980–81 academic year, it is stipulated that the appropriate amounts, with accumulated interest, would be refunded to the plaintiffs from the escrow account; otherwise, the escrowed amounts would be disbursed to defendants.

In another tuition rate case it has been held that the University's agreement to refund collected tuition differentials in the event of a final adverse judicial ruling constituted an explicit waiver of Eleventh Amendment immunity. *Moreno v. University of Maryland,* 645 F.2d 217, 220 (4th Cir.1981), *aff'd,* —— U.S. ——, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982). In the present case the tuition differential was not collected by the University from plaintiff Black, but it was deposited with the Clerk in escrow. Thus, unlike the *Moreno* court, this Court need not reach the question of waiver, because the tuition differential to which plaintiff Black is entitled for the 1980 fall semester is recoverable, not from the University, but from the escrow account.[21]

### CONCLUSION

On the basis of the foregoing findings the Court concludes that the imposition of the requirement of a one-year domicile as a prerequisite to eligibility for reclassification as a resident student for tuition purposes is violative of the Equal Protection Clause of the Fourteenth Amendment to the Constitution; and that this unconstitutional requirement resulted in the failure of University officials to reclassify plaintiff Black for purposes of the 1980 fall semester.

Therefore, in accordance with the stipulation of the parties approved by Order of this Court dated July 18, 1980, plaintiff Black is entitled to recover $870, with accumulated interest, from the escrow account established by the Clerk of Court, representing the difference between the resident and nonresident tuition rates for the 1980 fall semester.

All other requests for relief are hereby *DENIED.* The University is entitled to the balance of the escrowed funds on deposit with the Clerk of Court. Judgment shall enter in conformity herewith.

*SO ORDERED.*

### APPENDIX A

### UNIVERSITY OF MAINE

### BOARD OF TRUSTEES

### RULES GOVERNING RESIDENCE ·

A student is classified as a resident or a non-resident for tuition purposes at the time of acceptance to the University. The decision, made by the appropriate campus Business Manager, is based upon information furnished by the student's application and any other relevant information. No student once having registered as an out-of-state student is eligible for resident classification in the University, or in any college thereof, *unless* he or she has been a bona fide domiciliary of the State for at least a year immediately prior to registration for the term for which resident status is claimed. This requirement does not prejudice the right of a student admitted on a non-resident basis to be placed thereafter on a resident basis provided he or she has acquired a bona fide domicile of a year's duration within the State. *For University purposes, a student does not acquire a domicile in Maine until he or she has been here for at least a year primarily as a permanent resident and not merely as a student; if the*

---

**21.** In addition to asserting Eleventh Amendment immunity as a defense to the damage claims brought against them in their official capacity, *see Edelman v. Jordan,* 415 U.S. at 663, 94 S.Ct. at 1355, the individual defendants assert that, to the extent that relief is sought from them in their individual capacities, they are immune from monetary liability on the basis of the qualified immunity accorded to government officials acting in good faith with the reasonable belief that their actions are constitutional. *See Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Wood v. Strickland,* 420 U.S. 308, 318, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The ruling that recovery in this case be had from the escrow account obviates the need to determine these immunity claims.

student is enrolled for a full academic program as defined by the University, it will be presumed that the student is in Maine for educational purposes and the burden will be on the student to prove otherwise. In general, members of the Armed Forces and their dependents are normally granted in-state tuition rates during the period when they are on active duty within the State of Maine.

Subject to the provisions of the preceding paragraph, the domicile of an unmarried minor follows that of the parents or legally appointed guardian. The bona fide year-round domicile of the father, if living, otherwise that of the mother, is the domicile of such a minor; but if the father and the mother have separate places of residence, the minor takes the domicile of the parent with whom he or she lives or has been assigned by court order. If neither of the parents is living, the unmarried minor takes the domicile of the legally appointed guardian.

Subject to the provisions of the first paragraph above, an adult student, defined for purposes of these rules as one who is either married or eighteen years of age or older, will be classified as a resident of Maine if he or she has completed twelve (12) continuous months of domicile in Maine immediately preceding registration for the term for which resident status is claimed.

To change resident status, the following procedures are to be followed:

A. Submit "Request for Change of Residence Status" Form to the Business Manager. If the Business Manager's decision is considered incorrect:

B. The student may appeal the Business Manager's decision in the following order:

1. Vice-President for Finance and Administration—where applicable.

2. President

3. Treasurer of the University *

(This decision must be considered final.)

In the event that the campus Business Manager possesses facts or information indicating a change of status from resident to non-resident, the student shall be informed in writing of the change in status and will be given an opportunity to present facts in opposition to the change. The student may appeal the Business Manager's decision as set forth in the preceding paragraph.

No application will be considered for change after September 1 for the fall semester and January 1 for the spring semester.

All changes approved during a semester will be effective the beginning of the next semester; none are retroactive.

In all cases, the University reserves the right to make the final decision as to resident status for tuition purposes.

Approved Board of Trustees 3/28/73

---

APPENDIX B

UNIVERSITY OF SOUTHERN MAINE

REQUEST FOR CHANGE OF RESIDENCE STATUS

This form is to be completed by those whose admission to the University of Southern Maine was that of a non-resident and who now wish to be considered a Maine resident for tuition purposes. The form is to be sent to the Business Manager, 96 Falmouth Street, Portland, Maine, 04103, prior to September 1 for the fall semester and prior to January 15 for the spring semester.

NOTE:

PLEASE READ CAREFULLY

The following information will be used to assist the Business Manager in determining residency status and the length of residence in the State of

* Board Action 3/24/76 Amended 4/27/77

**1076** 

Maine. The Board of Trustees has ruled that a student must <u>prove</u> a one-year domicile prior to a change in out-of-state status.

Full Name: _____

Year-round Address: _____

Present School Address: _____

Soc. Sec. No. _____ Date of Birth: _____

1. Residence at time of initial application for admission: _____
_____

1a. Date of Admission (e.g. Fall Semester 1977): _____

2. Are you a member of the Armed Forces? Yes _____ No _____

2a. Are you a dependent of a member of the Armed Forces? Yes _____ No _____

2b. If yes, address of military station: _____
_____

3. Marital Status: Single _____ Married _____ Separated _____

4. Are parents, if living, residents of Maine? Yes _____ No _____

5. Bona fide year-round residence and the state in which father, if living, is employed; otherwise, that of mother or guardian: _____
_____

(If father and mother have separate places of residence, a minor takes the residence of the parent with whom he or she lives or that of the person to whom the minor has been assigned by court order.)

6. If married, what is the legal residence of your spouse? _____
_____

Revised 7/1/78

7. Have you purchased property in Maine? Yes _____ No _____
 If yes: Type _____
 Location _____
 Date of Purchase _____

8. Do you rent property in Maine? Yes _____ No _____
 If yes: Type _____
 Location _____
 Date of Occupancy _____

9. Are you a registered Maine voter? Yes _____ No _____
 If yes: Where _____
 Date of registration _____

10. Have you registered a motor vehicle in Maine? Yes _____ No _____
 If yes: Where _____
 Date of registration _____

11. Do you pay a Maine State Income Tax? Yes _____ No _____
 If yes: When was first year _____

(DOCUMENTATION REQUIRED FOR 7 THROUGH 11)

12. Where do you spend your school and summer vacation? _____
_____

13. Do you intend to remain in Maine after completion
 of your program? Yes _____ No _____

14. Have you attended another State of Maine
 educational institution? Yes _____ No _____
 If yes: Where _____
 Did you receive resident tuition rate? Yes _____ No _____

*I CERTIFY THE ABOVE STATEMENTS TO BE CORRECT*
*TO THE BEST OF MY KNOWLEDGE*

Date _____ Applicant's Signature _____

 Address _____

ACTION FOR CHANGE OF RESIDENCE STATUS:

_____ _____ _____ _____
Yes No Date Business Manager

Comments by investigatory agency: _____

APPEALS:

_____ _____ _____ _____
Yes No Date Vice-President, Finance & Administration

_____ _____ _____ _____
Yes No Date President

_____ _____ _____ _____
Yes No Date Vice-Chancellor for Finance,
 Chancellor's Office